Michael DUNN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2010–SC–000234–MR.

Supreme Court of Kentucky.

Feb. 23, 2012.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Jeffrey Allan Cross, Criminal Appellate Division, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant Michael Dunn was convicted in Montgomery Circuit Court of five counts of first-degree sodomy. He was sentenced to ten years' imprisonment for each count, to run consecutively for a total of fifty years. Appellant now challenges his convictions before this Court as a matter of right. Ky. Const. § 110(2)(b). This Court affirms.

## I. BACKGROUND

This case arose when L.M., a fourteen-year-old boy, reported that Appellant had forced him to have anal and oral sex at least seven times. L.M. is the nephew of Appellant's live-in girlfriend Delaine.[1] L.M. visited Appellant's house several times to go hunting or to do yard work. Appellant, who worked as an electrician, would sometimes ask L.M. to help him at job sites. L.M.'s father, John, also worked for Appellant from time to time.

L.M. testified that the first incident of sodomy occurred when he slept over at Appellant's house. Appellant, L.M., and John went hunting together one afternoon, and then Appellant invited L.M. to stay

the night and go hunting again the next morning. That evening, while Appellant was showing L.M. his gun collection in the bedroom, he told L.M. to take off his pants. When L.M. refused, Appellant threatened to shoot him. Appellant then had anal sex with L.M. after again threatening to shoot him. He used a condom and lubricant. L.M. said this happened in the fall of 2007, when L.M. was thirteen years old.

The next incident happened around Thanksgiving 2007. L.M. and John went to Appellant's house to do yard work. Appellant again asked L.M. to stay the night, and L.M. agreed because Appellant threatened him. That night, after John left, Appellant forced L.M. to have anal sex in the bedroom after threatening him with a knife. The next morning, Appellant told L.M. not to tell anyone about what had happened or else Appellant would slit his throat.

The next two incidents happened in March or April of 2008 when L.M. was helping Appellant do electrical work in an unfinished house. The house was in Montgomery County near the Powell County line. Several other men were working at the house, including John. When the other men left to get some supplies, Appellant grabbed L.M., pulled his pants down, forced him to bend over, and had anal sex with L.M. He did not use a condom, but he did use lubricant. Later that day, Appellant again forced L.M. to have anal sex at the house.

The final incident of anal sodomy happened in the fall of 2008. L.M. went to Appellant's house to go hunting early one morning. After hunting for some time, Appellant and L.M. went to an area near a

---

1. This opinion refers to Delaine (L.M.'s aunt) and John (L.M.'s father) by their first names because they have the same last name.

deer stand on Appellant's land. Appellant told L.M. to bend over the four-wheeler they were using. When L.M. refused, Appellant laid his gun on the four-wheeler, which L.M. interpreted as a threat. Appellant forced L.M. to have anal sex, using a condom and lubricant. Appellant discarded the condom on the ground in the woods.

L.M. also testified that Appellant forced him to perform oral sex on Appellant two times.

In November 2008, L.M. was sent to Stoner Creek Psychiatric Center because he was accused of killing cats and dogs. He disclosed to a counselor that Appellant had sodomized him. He was interviewed by Kentucky State Trooper Sam Hunt in December of 2008. L.M. believed he could find the place in the woods where he was sodomized in the fall of 2008, and so Trooper Hunt, L.M., and several other law enforcement officers hiked to the spot on Appellant's land where L.M. said the incident happened. After searching in the leaves and undergrowth, one of the officers found the condom that Appellant had discarded. The condom was later analyzed by a crime lab and found to contain semen that matched Appellant's DNA. L.M.'s DNA was also found on the condom.

At trial, Appellant called several witnesses to point out the inconsistencies in the dates that L.M. gave for the incidents, as well as in some of the details that he described. For example, Appellant argued that L.M. changed his story about what type of weapon Appellant used to threaten him, as well as when he was forced to have oral sex.

Appellant also took the stand himself and denied abusing L.M. at any time. He described trying to help L.M. and his family. In August of 2007, John asked Appellant if L.M. and his sister could live with Appellant for a brief time because John was having financial problems and was about to lose his home. L.M. and his sister lived with Appellant and Delaine for about three weeks. Appellant said he bought L.M. and his sister clothes and school supplies while the children were living with him.

At some point, a conflict developed between John and Appellant. John believed that Appellant and Delaine were trying to obtain custody of L.M. and his sister. When they were working at a job site together, John admitted to physically abusing L.M., and Appellant reported the abuse to social services. John continued to work for Appellant occasionally despite the conflict between them.

Appellant also explained why the condom with his semen was found near the deer blind in the woods. He said that a young woman named Lisa met him and L.M. when they were hunting in October of 2008. Appellant took Lisa for a ride on the four-wheeler, and then they had sex near the place where the condom was eventually found. Appellant said that he discarded the condom on the ground.

The jury convicted Appellant on five of the seven charged counts of sodomy. The jury recommended a sentence of ten years for each of the counts, and Appellant was sentenced to a total of fifty years' imprisonment.

## II. ANALYSIS

### A. Search and Seizure.

Appellant argues that the trial court erred when it refused to suppress the condom seized from his property during the search carried out by Trooper Hunt and other law enforcement officers. Appellant argues that the search violated his rights under the federal and state constitutions. For the reasons explained below, the trial court did not err and the condom was properly entered into evidence.

The trial court conducted a hearing on the motion for suppression of evidence and considered testimony from Trooper Hunt, the investigating officer. Trooper Hunt testified that soon after he interviewed L.M. in December 2008, he and four or five other officers from the Kentucky State Police and the local sheriffs department accompanied L.M. onto Appellant's property to search for the condom that L.M. said Appellant had used when he sodomized him in the fall of 2008. No warrant was secured before the search. The group of officers met on a third party's property and then hiked through the woods for about twenty minutes to reach the spot on Appellant's property where L.M. said the sodomy occurred, crossing a fence in the process. After arriving at the spot that L.M. described, the officers searched the ground and several minutes later found a condom under some leaves. The condom was collected and analyzed at a crime lab. It was later established that there was DNA material on the condom that matched Appellant's DNA and the victim's DNA.[2] At trial, the condom was the only physical evidence linking Appellant to the crimes.

The location where the condom was found was a heavily wooded area just off a four-wheeler trail and near a deer blind. Trooper Hunt estimated at the hearing that the spot was about 300 or 400 feet from a junkyard, which Trooper Hunt could see through the woods the day of the search. It was established that the junkyard was directly behind Appellant's house, so the spot where the officers searched was within several hundred feet of Appellant's house. The Commonwealth offered into evidence an aerial photograph of the area, and the defense provided a topographical map. Trooper Hunt was able to mark on the photograph and map all the relevant areas: Appellant's house, the junkyard, the area near the deer blind where the condom was found, and the location on a neighboring property where the officers parked before starting the search.

Appellant testified that he owned the land surrounding his house in common with other family members. Neither Appellant nor the other owners of the land gave permission to search the property. In the months and years before the search occurred, Appellant had made several efforts to prevent people from coming onto his land. He posted "no trespassing" signs and maintained a fence along parts of the property line. He put a letter in the local newspaper describing the boundaries of his property and stating that people who wished to use the trails on the property were required to ask permission. (Apparently, some members of the public had believed-incorrectly-that there was a public right-of-way across the property.)

Appellant argues that the area that was searched falls under the protection of the Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution because of the area's close proximity to his home and his efforts to keep the area private. He argues that the warrantless search was unconstitutional and so the evidence obtained should have been suppressed by the trial court.

 Generally, a house and its surrounding curtilage are protected by the Fourth Amendment's proscription against warrantless searches and seizures. *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The curtilage is defined as the area around a house that can be considered part of the

---

**2.** There was also other human DNA on the condom that could not be identified, perhaps because it had been degraded by exposure to the elements.

home itself because it harbors the "intimate activity" associated with the private life of the home. *Id.* (quoting *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). A homeowner's land that is beyond the area of the curtilage, however, is generally not subject to the Fourth Amendment's protections. *Oliver,* 466 U.S. at 178, 104 S.Ct. 1735 ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."); *Hester v. United States,* 265 U.S. 57, 58–59, 44 S.Ct. 445, 68 L.Ed. 898 (1924). This is known as the "open fields" doctrine. The term "open fields" is not as limited as it may appear on its face, and it can "include any unoccupied or undeveloped area outside the curtilage." *Oliver,* 466 U.S. at 180 n. 11, 104 S.Ct. 1735. "[A] thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." *Id.*

Appellant does not argue that the Kentucky Constitution provides more protection than the U.S. Constitution, and indeed this Court has consistently held that the protections of Section 10 of the Kentucky Constitution are no greater than those of the federal Fourth Amendment. *See Robbins v. Commonwealth,* 336 S.W.3d 60, 63 (Ky.2011); *LaFollette v. Commonwealth,* 915 S.W.2d 747, 748 (Ky.1996), *abrogated on other grounds by Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). And historically, Kentucky cases interpreting Section 10 on the specific issues of the open fields doctrine and the limits of the curtilage of a home are consistent with federal Fourth Amendment law. *See, e.g., Brent v. Commonwealth,* 194 Ky. 504, 240 S.W. 45, 49 (1922) (Section 10 was not intended to "safeguard vast tracts of land" but rather to protect the intimate possessions of every citizen); *Childers v. Commonwealth,* 198 Ky. 848,

250 S.W. 106 (1923) (discussing the limits of the curtilage of a home); *Richardson v. Commonwealth,* 205 Ky. 434, 266 S.W. 1 (1924) (same); *Fugate v. Commonwealth,* 294 Ky. 410, 171 S.W.2d 1020 (1943), *overruled in part on other grounds by Hay v. Commonwealth,* 432 S.W.2d 641 (Ky.1968); *Maddox v. Commonwealth,* 503 S.W.2d 481 (Ky.1973). Thus, Section 10's protections are the same as the Fourth Amendment's on the issues relevant to this case.

In *Dunn,* the U.S. Supreme Court laid out four factors to be considered in deciding whether an outdoors area near a house is part of the curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn,* 480 U.S. at 300, 107 S.Ct. 1134. The Court noted that the factors should not be applied mechanically; rather the central question is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301, 107 S.Ct. 1134.

■ Here, the trial court did not err in denying Appellant's motion to suppress the evidence because, under *Dunn,* the area that was searched was not within the curtilage of Appellant's home. The first *Dunn* factor, the distance from the home, does not support a finding that the searched area was part of the curtilage. It was never established exactly how far the searched area was from Appellant's home, but based on Trooper Hunt's estimate of the distance to the junkyard behind the home, it had to be more than 300 to 400 feet. Although there is no bright-line rule for the amount of area included

within the curtilage, "[s]tanding in isolation, this substantial distance supports no inference that the [searched area] should be treated as an adjunct of the house." *Id.* at 302, 107 S.Ct. 1134 (discussing a barn that was 150 to 180 feet from the home).

■ The second *Dunn* factor, whether the area is within an enclosure surrounding the house, also does not weigh in favor of finding that the area was in the curtilage. Although there was a fence around at least some of Appellant's land, it was not an enclosure that "demark[ed] a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." *Dunn,* 480 U.S. at 302, 107 S.Ct. 1134 (contrasting a fenced area immediately surrounding a home and a larger fenced area that was used for farming activities rather than domestic activities). Appellant testified that there was a fence along parts of his property line, and Trooper Hunt acknowledged that the officers had crossed a fence in the woods to get to the area they searched. The fence apparently marked portions of the edge of Appellant's large property rather than enclosing a relatively small area around the home; this was not a fence that enclosed a backyard or patio. *Cf. Quintana v. Commonwealth,* 276 S.W.3d 753, 760 (Ky.2008) (noting that most backyards would be considered part of the curtilage of the home). For these reasons, the second factor does not favor Appellant's claim.

■ The third factor, the uses of the area, also weighs against the claim that the area is part of the curtilage. The area that was searched was a wooded area near a deer blind and a four-wheeler trail. Appellant testified that he had managed the vegetation in the area with the goal of attracting deer. Hunting and riding four-wheelers are not "intimate activities of the home" that would show that the area was part of the curtilage. *Dunn,* 480 U.S. at 302, 107 S.Ct. 1134.

■ The fourth factor, the steps taken by the resident to protect the area from observation, lends some support to Appellant's claim. Appellant took steps to protect the area, including putting up "no trespassing" signs and a fence around parts of the property line, as well as publishing a letter in the local newspaper notifying the public that the area was privately owned. However, these efforts by the Appellant are not dispositive of the question whether the area is within the curtilage. In *Oliver,* the U.S. Supreme Court considered a wooded area behind the defendant's house that was fenced and marked with "no trespassing" signs. *Oliver,* 466 U.S. at 173, 104 S.Ct. 1735. The Court concluded that this area was not protected by the Fourth Amendment because the defendant could not have a legitimate expectation of privacy in an open field. *Id.* at 182, 104 S.Ct. 1735. Appellant cannot convert an open field to an area protected by the Fourth Amendment simply by posting signs and putting up a fence: "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." *Id.* at 182 n. 13, 104 S.Ct. 1735.

After considering the four *Dunn* factors and the overall character of the area in question, this Court concludes that it was not part of the curtilage of Appellant's home and therefore was not protected from warrantless search and seizure under the federal or state constitutions. There was no error in the trial judge's decision to allow the condom to be admitted into evidence.

**B. Bill of Particulars.**

Appellant argues that the trial judge erred by failing to order the Commonwealth to produce a bill of particulars. In a related argument, Appellant alleges that he was misled about which incidents were included in the indictment and that he was therefore denied proper notice. For the reasons explained below, there was no reversible error in the trial judge's handling of these issues.

The seven counts of sodomy in the indictment were identical and contained no specifics about where and when the acts were alleged to have occurred. Each count simply stated that Appellant "had committed the offense of Sodomy, First Degree when he engaged in deviate sexual intercourse with a minor, date of birth 1/31/94, by forcible compulsion."

Appellant filed a motion requesting that the Commonwealth provide a bill of particulars under RCr 6.22. When the motion was discussed during a pretrial hearing in March 2009, the trial judge pointed out that the prosecutor had an open file policy and so the defense counsel already had all of the discoverable information that the prosecutor had. Defense counsel responded that he did not have a recording of the grand jury proceedings, and the prosecutor agreed to correct this oversight. After this discussion, defense counsel did not renew the motion for a bill of particulars or pursue it further. The trial judge did not rule on the motion, but he directed that the record reflect that the Commonwealth would provide the grand jury recording.

Appellant argues that the trial court erred by not granting the motion for the bill of particulars, and that he was prejudiced by this error. He points out that many of the details of L.M.'s story changed between his initial interview with the investigating trooper and his testimony at trial. For example, L.M. gave differing dates for when the instances of sodomy occurred and differing accounts of what type of weapon Appellant used to threaten him. Appellant argues that he was unable to prepare an adequate defense because of the constant changes in L.M.'s allegations.

 If a defendant needs more information than what is included in the indictment in order to prepare his defense, he may file a motion for a bill of particulars. RCr 6.22; *Parker v. Commonwealth*, 291 S.W.3d 647, 656 (Ky.2009). But even after filing such a motion, a defendant may waive his request for a bill of particulars if the case goes forward and he does not object to the Commonwealth's failure to provide one. In *Hampton v. Commonwealth*, 666 S.W.2d 737, 740 (Ky.1984), the defendant filed a pretrial motion for a bill of particulars, but the Commonwealth never responded to it. Because the defendant did not pursue the motion for a ruling or object to the Commonwealth's failure to respond before the trial began, this Court held that he could not raise the issue of the bill of particulars on appeal. *Id.*

 Here, too, Appellant waived his request for a bill of particulars. At the pretrial hearing in which this motion was discussed, the trial court questioned why defense counsel needed a bill of particulars since the prosecutor had an open file policy. When defense counsel responded that he still had not received a recording of the grand jury proceeding, the prosecutor agreed to provide a copy. At that point, defense counsel appeared to be satisfied with this solution. He did not renew the motion or continue to argue that he needed a bill of particulars. As the case progressed, there was no further mention of the motion for the bill of particulars, and Appellant twice announced that he was ready for trial. Under *Hampton*, Appellant waived his request for a bill of particulars. *Id.*

Appellant relies heavily on *Finch v. Commonwealth*, 419 S.W.2d 146 (Ky.1967). In *Finch*, this Court's predecessor held that the trial court erred in overruling the defendant's motion for a bill of particulars. *Id.* at 147–48. It was prejudicial error because the prosecution was pursuing three different legal theories of the crime the defendant was charged with, and each theory was based on different evidence. *Id.* The Court held that "the presentation of these varied theories, without notice or warning, put an unreasonable burden of defense upon the defendants." *Id.* at 148. *Finch* is distinguishable from this case because here, the trial court did not rule on the motion for a bill of particulars. Because Appellant filed the motion but did not renew it or otherwise pursue it when the trial court failed to rule on it, the appropriate question is whether he waived his request for a bill of particulars under *Hampton*. As discussed above, this Court finds that he did waive his request under *Hampton*.

■ Moreover, Appellant cannot argue that his trial was rendered unfair because of L.M.'s inability to provide specific dates for the incidents. This Court has held that in prosecutions for child sex abuse, a child victim's vagueness about dates and times of incidents does not create a due process violation. In *Hampton*, the twelve-year-old victim of sexual abuse was somewhat confused and uncertain about when the assaults happened. *Hampton*, 666 S.W.2d at 740. At one point during his testimony, he said that two incidents had occurred on the same day, while at another time he said the second incident had happened on another Saturday. *Id.* The Court in *Hampton* held that there was no due process violation because "the evidence was as specific as is usually found in such cases and ample to separately identify the various offenses charged." *Id.* Similarly, this Court has held that a child victim's inability to give specific times and dates in a child sex abuse case does not render the evidence insufficient to support a conviction as long as the date of the offense is not a necessary element.[3] *Stringer v. Commonwealth*, 956 S.W.2d 883, 885–86 (Ky.1997).

*Hampton* and *Stringer* recognize that many victims of child sex abuse will have difficulty remembering exact times and dates. The reality that child victims will often be somewhat vague in their recollections of times and dates does not, by itself, render a defendant's trial unfair. Here, there were some inconsistencies in the dates and details provided by L.M., but L.M. was able to clearly delineate between each of the incidents and provide an estimate of when he believed they happened. Appellant was allowed to cross-examine L.M. and other witnesses about the inconsistencies in L.M.'s statements. For these reasons, Appellant was not unfairly prejudiced by L.M.'s inability to give specific dates for the incidents.

■ However, Appellant does raise one potentially troubling issue related to the specificity of the charges. Appellant claims that he was assured that the incidents that L.M. said happened at the un-

---

**3.** The date of the offense may be relevant if the offense is dependent on the victim being a particular age. For example, a defendant may be prosecuted for sodomy for engaging in deviate sexual intercourse with a person who is incapable of consent because he is younger than twelve years old. KRS 510.070(1)(b). In a prosecution under that portion of the statute, the victim's inability to give exact dates for the incidents may be problematic if it is possible that the victim had turned twelve by the time the incident occurred. But this case was prosecuted under the "forcible compulsion" portion of the sodomy statute, KRS 510.070(*l*)(a), so L.M.'s age was not an issue in this case.

finished house near the Powell County line were not among the charged offenses.[4] At a pretrial hearing on December 17, 2008, defense counsel asked Trooper Hunt about the charges:

> Defense Counsel: Other than the one, the last time you described, did everything else occur in Mr. Dunn's house?
>
> Trooper Hunt: There was one other incident that took place outside and that was the time that. . . .
>
> Defense Counsel: One other incident?
>
> Trooper Hunt: Correct. That wasn't in Mr. Dunn's residence and this little boy doesn't know exactly where that's at . . . other than that it was a place that Mr. Dunn was doing some electrical wiring and . . . that was an event there.
>
> Defense Counsel: Then the other times supposedly happened inside his residence?
>
> Trooper Hunt: That is correct. The seven times I brought the indictment for, of what I know, except for this one, I don't know where it occurred at.
>
> Defense Counsel: So five indoors, one where you went to search and then one other that he can't locate, but outside?
>
> Trooper Hunt: No. Six indoors. One outdoors.
>
> Defense Counsel: Oh. Okay. I misunderstood you. So the only time outside was when you went to the place you searched?
>
> Trooper Hunt: That's correct, except for the one the little boy couldn't tell me exactly where it was at.

> Defense Counsel: Oh. But that's not been charged?
>
> Trooper Hunt: That's correct.
>
> Defense Counsel: Okay.

Although this discussion is confusing, it seems that Trooper Hunt is saying that L.M. described an incident at a job site where Appellant was doing some electrical wiring, but because L.M. did not know where the job site was, this incident was not one of the charged crimes. It appears that Trooper Hunt believed that six of the charged crimes happened inside Appellant's house, and one happened outside at the "place [he] searched." And it appears that the one outdoors incident referenced by Trooper Hunt was the incident that occurred in the woods on Appellant's property. (Trooper Hunt and other law enforcement officers searched this area and found the condom with Appellant's semen.) Thus, based on Trooper Hunt's statements, six of the counts occurred inside Appellant's house, one occurred outdoors on his property, and the incident at the job site was not charged.

The discussion between defense counsel and Trooper Hunt took place during a bond hearing in December 2008. This was about three months before Appellant filed the motion for a bill of particulars and the trial court discussed the issue at another pretrial hearing in March 2009. At trial in January 2010, L.M. testified at length about the incidents at the job site where Appellant was doing electrical work. At trial, L.M. said that Appellant forced him to have anal sex twice on the same day while they were alone in the unfinished house. L.M. was able to describe the location of the unfinished house, stating that it was in Montgomery County near the Pow-

---

**4.** If Appellant is correct about this issue, it would not be waived by his failure to renew the motion for a bill of particulars. If he had been misinformed about what incidents were charged, he would have had no reason to try to get additional information about the incident at the unfinished house.

ell County line and providing the name of the road it was on. This testimony about the location of the house was apparently much more detailed than the information that Trooper Hunt had at the time of the pretrial hearing in December 2008. (At the hearing, Trooper Hunt said that L.M. didn't know where the house was located, but at trial, L.M. was able to give a fairly specific description of the location.) L.M.'s testimony about what happened at the job site provided the basis for two of the counts of sodomy.

Appellant argues that Trooper Hunt's statements at the bond hearing were in effect an assurance by the Commonwealth that any incidents at the job site were not among the charged crimes. Appellant argues he was prejudiced when L.M. testified at trial about the incidents at the job site because he did not have notice that these incidents were charged.

If the Commonwealth assured a defendant before trial that he was not being prosecuted for a particular crime, and then did prosecute that crime at trial, it could certainly affect the defendant's ability to prepare a defense, and it could create "prejudicial surprise" at trial. *Abbott v. Commonwealth*, 822 S.W.2d 417, 419 (Ky. 1992) (explaining that the purpose of a bill of particulars is to allow the defendant to understand the charges against him and prepare his defense).

However, it is not clear from the record in this case that the defense was actually surprised by L.M.'s testimony about the incidents at the job site. In fact, after reviewing the information that has been provided to the Court, it seems just as likely that Appellant learned that these incidents would be presented at trial at some point during the year and two months between Trooper Hunt's statement at the pretrial hearing and the start of the trial.

At trial, it did not appear that Appellant was surprised by the allegations about the job site. Most significantly, Appellant did not object at any point to L.M.'s testimony about the job site. And it appeared that Appellant was prepared to attack the allegations involving the job site. During cross-examination of Trooper Hunt, Appellant elicited testimony that there were differences in L.M.'s trial testimony about the job site and what he had said in an initial interview. When Appellant himself testified later in the trial, he provided the name of the person who owned the house near the Powell County line, and he testified that the house was completely finished by December 2007 (meaning that L.M.'s assertion that the incidents occurred in February or March 2008 was false). Additionally, Appellant did not raise the issue of the incidents at the job site in his motion for a new trial filed soon after the trial. The first indication that there was a possible problem with L.M.'s testimony about the job sites came in Appellant's brief on appeal.

Based on Appellant's reaction to L.M.'s testimony at trial, it seems likely that Appellant did learn at some point that the allegations about the incidents at the job site would be presented at trial. Without more information, it would be speculative to assume that Appellant was surprised by L.M.'s testimony about the job site when his actions at trial indicate that he was not surprised.

Even assuming for argument that Appellant did *not* learn prior to trial that the incidents at the job site would be presented at trial, his failure to object to the testimony at trial left the alleged error unpreserved for ordinary appellate review. At best he could have the claim reviewed for palpable error. RCr 10.26. But Appellant has not shown that this alleged error rose to the level of palpable error.

On appeal, an appellant bears the burden of demonstrating that an error was palpable. *Grady v. Commonwealth,* 325 S.W.3d 333, 355 (Ky.2010). Here, Appellant has not explained how he was prejudiced, much less subjected to a manifest injustice, by this alleged error; he simply argues that "[t]his violation of proper notice is insurmountable." Without more, this Court declines to speculate that manifest injustice occurred as a result of Trooper Hunt's statement at the pretrial hearing. RCr 10.26.

### C. Motion to Admit Evidence of Victim's Behavior and Character.

Pursuant to KRE 412(c)(1), Appellant filed a motion a few weeks before trial asking the court to allow evidence of L.M.'s previous sexual behavior. Appellant wanted to question L.M. about evidence that he had told a physician that a janitor at his school had tried to sexually assault him. The morning of trial, the trial judge heard arguments on the motion in chambers. Appellant argued that the fact that L.M. apparently never repeated this allegation to other counselors or police officers who interviewed him, as well as the lack of corroborating evidence, led to the inference that the allegation was false. The judge denied the motion because of the lack of information about the allegation. The judge pointed out that there was no information about when the alleged sexual assault happened or any details about what it involved.

Appellant argues that he was entitled to a hearing under KRE 412(c)(2), with the victim present, to ask him about the allegation and to argue to the trial court that this evidence should be admissible. The trial judge did not err in his handling of this issue. For the reasons explained below, the trial judge applied the proper standard in denying the motion, and Appellant was not entitled to a KRE 412(c)(2) hearing on the issue.

KRE 412 limits the admission of character evidence about a victim of sexual misconduct. It was designed to protect victims from irrelevant and embarrassing attacks on their character based on their sex lives. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.30[2][3] (4th ed.2003). In this case, the initial question is whether KRE 412 even applies to the evidence at issue. Evidence of a false allegation of sexual assault is not, in a literal sense, "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior" or "[e]vidence offered to prove any alleged victim's sexual predisposition," the two categories that KRE 412 addresses. KRE 412(a)(1)–(2). However, this Court has held that an assertion that a victim has made a false allegation implicates KRE 412 because of the danger that the underlying purpose of the rule—to protect victims of sexual misconduct from unwarranted attacks based on their sexual history—may be circumvented. *Dennis v. Commonwealth,* 306 S.W.3d 466, 472 (Ky.2010). Inquiry into a purportedly false allegation has the potential to "shift[ ] the focus from the real issues" and "effectively put the victim on trial." *Kreps v. Commonwealth,* 286 S.W.3d 213, 221 (Ky.2009) (quoting *Hall v. Commonwealth,* 956 S.W.2d 224, 227 (Ky. App.1997)). And if the victim is telling the truth about the prior allegation, then the evidence would clearly fit under the "other sexual behavior" category of KRE 412(a)(1). Because of these concerns, this Court held in *Dennis* that KRE 412 does apply to evidence of a prior false allegation, and "the proponent of [evidence of a false allegation] is required to make a preliminary showing that the prosecuting witness made a prior accusation and that the accusation was in fact false." *Dennis,* 306

S.W.3d at 472. Therefore it was appropriate for the trial judge to consider this evidence under KRE 412.

■ The next question is whether Appellant met his burden of making a preliminary showing that L.M.'s allegation against the janitor was false. In *Dennis*, this Court held that a defendant must show that the victim's prior allegation was "demonstrably false." *Id.* at 474–75. This fairly high standard had previously been adopted by the Kentucky Court of Appeals as well as other state courts.[5] *See Capshaw v. Commonwealth*, 253 S.W.3d 557 (Ky.App.2007); *Hall*, 956 S.W.2d 224; *see also Dennis*, 306 S.W.3d at 472–73 (discussing the standards used in various states). *Dennis* explained that "demonstrably false" means "that there is a distinct and substantial probability that the prior accusation was false." *Id.* "This heightened standard of proof is meant to exclude the evidence where the proponent's only proof of falsity is the alleged perpetrator's denial and/or an inconclusive investigation of the allegation. Self-serving denials and investigations that do not exonerate but merely fail to substantiate are not sufficiently probative of falsity to justify breaching the alleged victim's shield." *Id.*

Here, Appellant did not make a preliminary showing that L.M.'s allegation against the janitor was demonstrably false. Appellant argues that the fact that L.M. only told one physician about the janitor's alleged misconduct, and not any of the other doctors, counselors, and police officers who interviewed him, supports an inference that it is false. Appellant also argues that there was never any corroborating proof of the allegation, and that this supports an inference that it was false. This evidence clearly does not meet the "demonstrably false" standard. The fact that L.M. told only one person about the janitor's misconduct does not demonstrate that the allegation was false. There are many possible explanations for why a young teenager who had suffered sexual abuse would only tell one person about it. And the fact that there was apparently no investigation that could have provided corroborating proof has no bearing on the truth or falsity of L.M.'s allegation; a young victim of sex abuse obviously has no control over whether an investigation is conducted. The trial judge was correct in his ruling that the information provided by Appellant was simply too vague "to justify breaching the alleged victim's shield." *Id.*

■ Appellant argues that he was entitled to a hearing under KRE 412(c)(2) on the issue of the admissibility of the evidence. KRE 412(c)(2) provides:

> Before admitting evidence under this rule the court must conduct a hearing in camera and afford the victim and parties a right to attend and be heard. The motion, related papers, and the record of the hearing must be sealed and remain under seal unless the court orders otherwise.

Appellant interprets this rule as giving him the right to a hearing to make the preliminary showing that the prior allegation against the janitor was demonstrably false. He argues that the victim must be

---

**5.** *Dennis* was decided in March 2010, two months after the trial in this case. At the time of the trial, the controlling precedent for the trial court was the line of Court of Appeals cases following *Hall*, 956 S.W.2d 224, which held that a prior accusation was only admissible if it was demonstrably false. *Den-* nis adopted the "demonstrably false" standard from *Hall* and provided more guidance on how it should be applied. Thus, it does not matter for the analysis in this case that *Dennis* had not yet been decided at the time of the trial.

present in order to have a proper KRE 412(c)(2) hearing, or at least that the defendant has the right to request the victim's presence in order to make the victim available for questioning at such a hearing. Appellant would have used the hearing to question L.M. about his allegation against the janitor. For the reasons explained below, Appellant's interpretation of KRE 412(c)(2) is incorrect.

This section of the rule is designed to further the underlying purpose of KRE 412 of protecting the victim of sexual misconduct. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.30[6] (4th ed.2003). Everything about KRE 412(c)(2) is concerned with protecting the victim: any hearing must be conducted *in camera* and all the records and related papers must be sealed, and there is the unusual provision that the victim has a *right* to be heard, if he or she wishes, before the trial court allows the evidence.

KRE 412(c)(2) only requires a court to conduct a hearing "[b]efore admitting evidence under this rule," not whenever a court makes a ruling about KRE 412 evidence. This is because KRE 412(c)(2) is focused on protecting the victim; obviously the victim would have no need to be heard if a judge rules *not* to admit evidence under KRE 412. This section does not give the defendant the right to a hearing to make the showing that the prior allegation was demonstrably false (although if a KRE 412(c)(2) hearing is held, the defendant has a right to attend and be heard).

The defendant has the same right to have the trial court consider his motion to admit KRE 412 evidence as he would to have the court consider any other evidentiary question. Whether a prior allegation is "demonstrably false" is a preliminary question that must be answered by the trial judge in deciding whether this type of evidence is admissible under KRE 412.

Thus, the decision is governed by KRE 104, which deals with preliminary questions. In *Dennis*, this Court held that a prior accusation is "not admissible at trial unless the proponent of the evidence establishes at a KRE 104 hearing that the prior accusation was demonstrably false." *Dennis*, 306 S.W.3d at 475. If the trial judge reviews the motion and the parties' arguments and decides that the prior accusation is not "demonstrably false," there is no need to continue on to a KRE 412(c)(2) hearing. That is what happened in this case. The trial judge reviewed the motions, held a KRE 104 hearing, and decided that Appellant had not met his burden of showing that the prior allegation was demonstrably false. Therefore a KRE 412(c)(2) hearing was not necessary. A KRE 412(c)(2) hearing is appropriate if, after reviewing relevant evidence and arguments, the trial judge is inclined to allow the evidence or wants to hear more information about the issue. In that situation, the victim must be given the opportunity to be heard before the trial judge makes the decision to allow the evidence.

For these reasons, the trial judge did not err in denying Appellant's motion to allow evidence of L.M.'s prior allegation against the janitor.

### D. Possible Exculpatory Evidence in L.M.'s Psychotherapy Records.

Appellant argues that the trial judge erred by refusing to provide to the defense certain portions of L.M.'s psychotherapy records. Both before and after he made the allegations against Appellant, L.M. had received counseling and treatment from several social services organizations. Upon Appellant's request, the trial judge reviewed L.M.'s psychotherapy records *in camera* and provided to the parties the documents that he believed to be exculpatory. At a status hearing, the defense counsel expressed surprise that the

judge had returned so few documents and asked if the records had included information about L.M.'s abuse at the hands of his father, John. The judge explained that there was some information about John's abuse of L.M. but he did not believe it was relevant to the case against Appellant. The judge said the records contained information that John had been physically abusive toward L.M. when disciplining him, but that there was no indication that L.M. had been sexually abused by anyone other than Appellant. The judge said that much of the information about the physical abuse was from four to six years before, and that there was not much detail about the abuse.

Appellant argues that the trial judge should have turned over all the information related to John's abuse of L.M. because it was exculpatory in that it explained L.M.'s motivation to fabricate the allegations against Appellant. Appellant's theory is that L.M.'s fear of his father led him to make up the allegations against Appellant to deflect attention and anger onto Appellant. Because John already had a tense relationship with Appellant, L.M. could have believed that John would focus his anger on Appellant rather than L.M. L.M. made the allegations against Appellant while he was at a psychiatric center; he had recently been accused of killing cats and dogs, and he had disclosed to his counselor that John had abused him. Appellant believes that the context in which L.M. first reported being sexually abused makes John's physical abuse of L.M. relevant. The Commonwealth responds that this theory about L.M.'s motivation does not make sense because L.M. did not want his father to know about the abuse. L.M. testified that he was afraid of what John would do when he found out about the abuse, and when L.M. told his stepmother about the abuse, he made her promise not to tell anyone. Thus, the Commonwealth argues, the information about John's phys-

ical abuse of L.M. is not exculpatory and the trial judge was correct in refusing to provide it to the parties.

 As a general matter, a psychotherapy patient has a privilege against disclosure of his confidential communications with his psychotherapist. KRE 507(b). In *Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky.2003), this Court held that a criminal defendant's constitutional right to discover exculpatory evidence prevails over the psychotherapist-patient privilege, and so the parties must be given access to exculpatory information in a witness's psychotherapy records. But to preclude "fishing expeditions" into psychotherapy records, *Barroso* required a two-step process before evidence from the records may be turned over to the defense. *Id.* at 563–64. "First, the defendant must produce 'evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence.' Second, the trial court must conduct an *in camera* review to determine whether or not the records sought actually do contain such evidence." *Commonwealth, Cabinet for Health and Family Services v. Bartlett*, 311 S.W.3d 224, 227 (Ky.2010) (quoting *Barroso*, 122 S.W.3d at 563–64) (citation omitted).

Here, neither party disputes that the trial judge followed the proper two-step procedure. The judge properly conducted the *in camera* review of the records and did find that some of the documents were exculpatory; he provided copies of those documents to the parties. The dispute here is whether the evidence about John's physical abuse of L.M. should be considered "exculpatory." If it is exculpatory, the documents that discuss that abuse should have been included in the materials provided to the parties.

 Exculpatory evidence is defined as "evidence favorable to the accused

and material to guilt or punishment, including impeachment evidence." *Barroso*, 122 S.W.3d at 564. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 433–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (discussing the materiality standard); *Strickler v. Greene*, 527 U.S. 263, 289–96, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (same).

Here, Appellant's theory of how John's abuse of L.M. resulted in L.M.'s motivation to accuse Appellant of sexual abuse is just too speculative and attenuated for the evidence to be exculpatory. Appellant's theory requires a series of assumptions about L.M.'s psychological motivations that are not supported by the evidence. It is mere speculation that L.M. would try to deflect John's anger by making up a story of sexual abuse perpetrated by Appellant. And as the Commonwealth points out, Appellant's argument that L.M. fabricated the allegations in order to focus his father's attention on Appellant rather than L.M. is belied by the fact that L.M. repeatedly told interviewers—and testified in court—that he did not want his father to know about the abuse. For these reasons, it is not clear that the evidence of John's abuse was favorable to the defense, and it certainly was not "material to guilt or punishment"; there is not a reasonable probability that, if the evidence from L.M.'s psychotherapy records about John's physical abuse had been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. Therefore, the trial judge did not err in finding that this information was not exculpatory and in declining to provide the documents to the parties.

### E. Change of Venue.

■ Appellant argues that the trial court erred by not granting his motion for a change of venue. Appellant argued that he could not receive a fair trial in Montgomery County because of the publicity surrounding both the sodomy charges and Appellant's fatal shooting of his neighbor in February 2008. (A grand jury had declined to charge Appellant with any crimes related to the shooting.) In support of his motion, Appellant produced eight affidavits from Montgomery County residents (seven of whom testified at a hearing) stating that they believed that Appellant could not receive a fair trial in the county, that they had heard other people make comments about Appellant's guilt in this case, and that Appellant had long been a "controversial person" in the county because of incidents that happened prior to this case. Appellant produced eleven newspaper articles from the *Mt. Sterling Advocate* that discussed this case, the February 2008 shooting incident, and Appellant's involvement as a witness in a 2003 murder-for-hire case. Appellant also provided the court with more than forty pages of printouts from the social website Topix.com in which commenters discussed the sodomy case and other allegations against Appellant.

The trial judge conducted a hearing on Appellant's motion that lasted over an hour and a half. The judge held that Appellant had not shown the necessity of a change of venue at that time, but he indicated that he would be willing to reconsider the venue issue if it became clear during voir dire that the jury panel was prejudiced.

■ Under both the due process clause and KRS 452.210, the defendant is entitled to a change of venue if it appears that he cannot receive a fair trial in the

county where the prosecution is pending. *Wilson v. Commonwealth,* 836 S.W.2d 872, 888 (Ky.1992), *overruled on other grounds by St. Clair v. Roark,* 10 S.W.3d 482 (Ky. 1999). "In determining the proper venue for a criminal trial, the central concern is necessarily to afford the defendant a fair trial...." *Wood v. Commonwealth,* 178 S.W.3d 500, 513 (Ky.2005). A change of venue is appropriate upon a showing that there has been prejudicial news coverage prior to trial and that the effect of such news coverage is "reasonably likely to prevent a fair trial." *Wilson,* 836 S.W.2d at 888(citing *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)).

Here, the trial judge did not err in denying the motion for a change of venue. The judge conducted a thorough hearing and considered all the evidence presented by Appellant. The judge believed that the witnesses who signed affidavits and testified at the hearing were not representative of the jury pool because they were all friends and acquaintances of Appellant, and so they would likely be excused from the jury if called. And the judge pointed out that many of the anonymous commenters on Topix.com would not be potential jurors because they were not Montgomery County residents (the website lists the location of each commenter, and many who commented about Appellant's case were located in other parts of Kentucky, or even out of state). The judge acknowledged that the *Mt. Sterling Advocate* had run articles about the case and the previous allegations against Appellant, but he did not believe this would necessarily prejudice the entire jury panel because he believed there were many people in the county who would not have been exposed to the articles. In addition, the judge noted that there had been no articles about Appellant for several months before the hearing, so publicity about the case appeared to have

waned. In light of these findings, this Court concludes that the trial judge did not abuse his discretion in deciding that the pretrial publicity was not "reasonably likely to prevent a fair trial." *Wilson,* 836 S.W.2d at 888.

Importantly, the trial judge stated at the pretrial hearing that he would reconsider the issue if it became clear during voir dire that Appellant could not get a fair trial in Montgomery County. There were apparently no such problems during voir dire. Defense counsel asked the panel if they had heard or read anything about the case. Any potential jurors who raised their hands were called to the bench individually to be questioned by the judge and the parties. Although a handful of potential jurors said they had read newspaper articles or headlines about the case, they indicated they had not formed an opinion on the case and that the pretrial publicity would not affect their ability to be impartial. Considering the totality of the circumstances, these jurors' prior exposure to newspaper articles about the case did not disqualify them from service. *See Montgomery v. Commonwealth,* 819 S.W.2d 713, 716 (Ky.1991) "[T]he mere fact that jurors may have heard, talked, or read about a case does not require a change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant ...." (quoting *Brewster v. Commonwealth,* 568 S.W.2d 232, 235 (Ky.1978) (internal quotation marks omitted)).

The apparent absence of any difficulty in seating a jury that had not been prejudiced by pretrial publicity belies Appellant's claim that change of venue was required. In fact, Appellant was apparently satisfied at voir dire that the publicity was not a problem, as he did not renew his motion for a change of venue, despite the

trial judge's stated intention to revisit the issue if necessary. *See Hodge v. Commonwealth*, 17 S.W.3d 824, 836 (Ky.2000) (a defendant's failure to renew a motion for change of venue at voir dire waived the issue); *Johnson v. Commonwealth*, 892 S.W.2d 558, 562 (Ky.1994) (same). On appeal, Appellant does not allege that any jurors who were actually seated were biased because of the pretrial publicity, and he does not argue that he was forced to use peremptory strikes to remove jurors exposed to the publicity.

For the reasons given above, the trial judge did not err in denying the motion for a change of venue, and there is no indication that the pretrial publicity affected the fairness and impartiality of the jury.

### F. Jurors with Family Members Who Were Victims of Sexual Abuse.

■■■ Appellant argues that two of the jurors should have been excused for cause because they had close family members who were victims of sexual abuse. During voir dire, the prosecutor asked the jury panel if any of them had friends or family members who had been sexually abused. The jurors who raised their hands were called to the bench individually and questioned by the judge, the prosecutor, and defense counsel. Of the eight potential jurors who came forward, six were excused for cause. Defense counsel moved that the other two jurors be excused for cause, but the trial judge denied the motions. Defense counsel used peremptory strikes on these two jurors and informed the court of the two jurors he would otherwise have used his strikes to remove, thus preserving the issue for appellate review under *Gabbard v. Commonwealth*, 297 S.W.3d 844, 854 (Ky.2009).

Juror A said that his daughter had been the victim of sexual abuse in 2002, about eight years before the trial. He said that the person who "touched her inappropri-

ately" had been prosecuted. He said that he did not think his daughter's experience would affect his ability to be fair because he was a "pretty analytical" person.

Juror B said that his wife had been raped by her stepfather. Although the juror did not say how long ago this happened, it can be assumed that it was some time ago because the juror was fairly elderly. He said that what happened to his wife would not affect his ability to be fair and impartial. He said that he would not lean toward the prosecution if it was a close case.

■■■ A defendant is entitled to an impartial jury. "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." RCr 9.36. A trial judge's denial of a motion to excuse for cause is reviewed for abuse of discretion. *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky.2007).

■■■ "[T]he mere fact that a prospective juror has been the victim of a crime similar to the crime being tried does not by itself imply a disqualifying bias. Additional evidence of bias is required." *Brown v. Commonwealth*, 313 S.W.3d 577, 598 (Ky.2010) (victim of burglary); *see also Richardson v. Commonwealth*, 161 S.W.3d 327, 330 (Ky.2005) (victim of sexual abuse); *Sanders v. Commonwealth*, 801 S.W.2d 665, 669 (Ky.1990) (victim of robbery). The same logic applies to a person who has a family member or friend who was the victim of a crime similar to the one being tried. *Woodall v. Commonwealth*, 63 S.W.3d 104, 118 (Ky.2001) (sister of rape victim); *Hodge v. Commonwealth*, 17 S.W.3d 824, 838 (Ky.2000) (neighbor of murder victim).

Sexual abuse of a child is a crime that creates strong emotions. Indeed, most of the potential jurors in this case who had personal experience with sexual abuse admitted that it could affect their ability to be impartial, and they were excused for cause. But disqualification is not automatic. Both Juror A and Juror B said that they believed they could be fair and impartial. They candidly answered questions from the judge, the prosecutor, and defense counsel. Neither juror needed to be "rehabilitated"—that is, asked if they could set aside their prejudice or bias to decide the case on the evidence—because they both stated unequivocally that they could be impartial. *See Richardson*, 161 S.W.3d at 330. Therefore, there was no "additional evidence of bias" that would necessitate disqualification. *Brown*, 313 S.W.3d at 598. The trial judge did not abuse his discretion in deciding that Juror A and Juror B could be fair and impartial despite their family members' experiences.

## III. CONCLUSION

For the foregoing reasons, Appellant's convictions are affirmed.

All sitting. All concur.