RENDERED: JULY 1, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0148-MR

CORVELL CONLEY        APPELLANT

v.        APPEAL FROM HARDIN CIRCUIT COURT
HONORABLE KEN M. HOWARD, JUDGE
ACTION NO. 18-CR-00415

COMMONWEALTH OF KENTUCKY        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; K. THOMPSON AND L. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Covell Conley appeals from his sodomy conviction and sentence imposed after a jury trial by the Hardin Circuit Court. Conley argues the exclusion of evidence precluded him from presenting a meaningful defense, a juror should have been stricken for cause, the prosecution should not have been allowed to tell the jury the deoxyribonucleic acid (DNA) matched Conley, and a sexual assault nurse examiner (SANE nurse) should not have been allowed to

identify Conley as the perpetrator based upon hearsay. We affirm as the trial court did not commit error in its rulings and the unpreserved errors did not result in manifest injustice.

On August 24, 2018, Conley, who was a head coach for a girls travel basketball team, drove three girls to and from practice, twin sisters and J.Y. (the victim). The next day the victim, who was fourteen years old, reported to her mother that Conley had sexually assaulted her. According to the victim, after getting McDonald's food for the twins and taking them home, Conley drove past the victim's home to a second McDonald's, got her food and then drove and parked at a recycling place, at which time he got into the backseat, pulled her pants down, licked her vagina, and then put a condom on and had sex with her.

The victim's mother took her to the police station and then a local hospital for an examination. The victim's underwear from that night was collected. The victim, at the direction of law enforcement, exchanged Snapchat messages with Conley and called him.

The police obtained a warrant for Conley's DNA, which was collected with a buccal swab of the interior of his cheek. Then they interrogated him. Conley made statements about letting the victim drive his vehicle while he was drinking, then recanted this story and then stated, "I must have done it." Conley was indicted for third-degree rape and third-degree sodomy.

On October 31, 2019, Conley filed a motion pursuant to Kentucky Rules of Evidence (KRE) 412 to be allowed to testify regarding intimate touching he claimed he observed between the victim and another girl in the back seat of his car. This motion was denied.

The jury trial took place from November 4, 2019, through November 8, 2019. Several witnesses testified including Kentucky State Police (KSP) laboratory employees as expert witnesses, the victim, the victim's mother, the SANE nurse, the detective, and Conley. The expert witnesses testified about the examination of the victim's underwear, how it was positive for alpha-amylase, and so presumptively positive for saliva (although certain other bodily fluids could have caused the positive test), and the DNA results obtained from a cutting of this underwear. One of the KSP experts, Alison Tunstill, testified she tested samples given to her for certain locations on the Y chromosomes in a process known as Y-STR as that is an appropriate way to eliminate DNA belonging to the victim and make sense of a smaller sample from a male. She testified that the Y-STR DNA results comparing Conley's buccal sample and sample from the underwear made Conley or one of his male lineage relatives 1,626 times more likely to have contributed to this DNA profile than another male in the United States population.

At the conclusion of the trial, the jury acquitted Conley of rape and convicted Conley of sodomy. The jury recommended a sentence of four years' incarceration.

On November 13, 2019, Conley filed a motion for a directed verdict or, in the alternative, a motion for a new trial. As is relevant for this appeal, Conley argued that Juror 255 should have been excluded and the KRE 412 evidence should have been admitted.

On January 23, 2020, the trial court denied Conley's motion and sentenced him in accordance with the jury's recommendation.

Conley's first argument on appeal is that the trial court's decision to prohibit him from presenting evidence of an alternative method for how the DNA evidence got on the victim's underwear violated his right to present a meaningful defense.

Conley initially raised the issue of whether he could present evidence under an exception to our rape shield law, that generally requires evidence of a victim's prior sexual behavior to be excluded, in a pretrial motion filed the Friday before the trial which was scheduled to begin on a Monday. Conley argued he should be able to offer evidence that he saw the victim and another girl engaged in intimate behavior in his car after practice the evening of the charged event. He stated that "he observed the girls touching, and that [the victim] had her shorts

pulled down, exposing herself in Mr. Conley's car." Conley argued the purpose of this evidence was pertinent: "(1) to show that [victim] had reason to make false sexual assault allegations against Mr. Conley in order to not get in trouble with her parents, and; (2) explain how DNA consistent with Mr. Conley's genetic profile was present on [the victim's] underwear[.]" Conley excused his delay in making the motion inside the fourteen day period, as required by KRE 412(c)(1)(A), because the defense was not able to consult with its retained expert about the underlying information regarding the report from the KSP laboratory until October 28, 2019. Conley stated in his motion that it was only at that time that

> Mr. Conley's defense team became aware of potential
> benign explanations for how Mr. Conley's genetic
> material might exist on [the victim's] underwear, or
> alternatively, how [the victim's] underwear came into
> contact with Mr. Conley's genetic material – the car was
> strewn with Mr. Conley's clothing and personal
> belongings, which were present due to his frequent use of
> the car in his capacity as coach and for his personal use.

The trial court considered the motion on the first day of the trial and argument was had as to whether the motion could have appropriately been filed sooner and notice provided to the victim's family. The trial court questioned why a theory that Conley's DNA was found on victim's underwear via transfer contact rather than direct contact required KRE 412 evidence, asking:

> Whether an individual is engaging in activity intimate
> with another person or changing clothes, does it really
> matter? It is whether or not it [the victim's underwear]

came into contact with other clothing that there could have been a transfer of his genetic material. That is the defense.

Defense counsel argued: "Your honor, we would expect testimony that he saw her pulling up her shorts or – and, we, that's all we want." Later, in response to further questioning about the transfer theory, defense counsel stated the KRE 412 evidence was necessary to show how the DNA got on the victim's underwear "[b]ecause he saw her pulling up her shorts, and if your honor would allow us to get into that without saying it was sexual activity then the 412 motion is moot."

On November 6, 2019, the trial court denied the motion, explaining that while it was procedurally untimely and the victim's family should have been notified, the court's denial was about more than Conley's failure to follow the procedural requirements of the rule. The trial court explained that the KRE 412 evidence Conley sought to introduce was of limited probative value in explaining how the genetic material was transferred to the victim's underwear and greatly outweighed by the harm KRE 412 was intended to prevent to the victim. The trial court explained that the defense still had the opportunity to present its transfer theory without the KRE 412 excluded evidence about intimate contact between the two girls.[1]

---

[1] The following exchange took place between the trial court and defense counsel:

During Conley's testimony, the following exchange took place regarding what Conley observed when he came back outside with one of the girls from McDonald's, returning to the other girl and the victim who had remained in the backseat of the car:

> Q: "When you got back to the car, did you? What did you see?"
>
> A: As we got back to the car, I saw some fumbling around from the two that were left in the car."
>
> Q: "When you say 'fumbling around' what?
>
> A: One was adjusting clothes of the other, just kind of moving them around."

---

Trial Court: Is there probative value as to whether there was intimate, sexual activity occurring in the backseat? Whether somebody was changing clothes? Or does it even matter? Really, what is probative is – was there evidence that the victim's underwear came into contact with clothing of the defendant? How that occurred . . . has slight probative value . . . because it doesn't prevent Mr. Conley from presenting his defense. He can still present his defense that his genetic material was in the alleged victim's underwear because that underwear came into contact with – as I understood it – other clothing of his that would have contained his genetic material. And that is how that is the explanation that the defense wants to offer. And the defense still has that opportunity. Okay, so under that analysis . . .

Defense Counsel: Just so we are clear, are you saying he can say he saw her pulling up her shorts? Or are you saying we can't go there at all?

Trial Court: The ruling is, what I'm not allowing is evidence that he observed [the victim] and another girl engaging in behavior of an intimate nature in his car, that they were touching. Those are allegations of a sexual nature. They are prevented by KRE 412.

No further questions were asked of Conley on this topic.

After Conley's conviction on the sodomy charge, Conley filed a motion for a directed verdict or in the alternative a motion for a new trial. In this motion, he again argued he should have been permitted to introduce evidence stating that he observed intimate contact between the victim and another girl to explain the presence of his genetic material on the victim's underwear.

In denying this motion, the trial court noted that when it asked the defense about other ways to assert a transfer contact defense without KRE 412 evidence, defense counsel acknowledged it could be explored "without saying it was sexual activity" that allowed the transfer to take place. The trial court concluded:

> What is of probative value for Conley is evidence the victim's underwear came in contact with other clothing in the back of the Defendant's car on that evening. How this contact could have occurred, and more specifically that this contact came from alleged sexual activity of the victim with another minor, has slight probative value. . . . Conley was allowed to testify he saw the victim "fumbling around" in the back of the car on the night of the incident and that testimony allowed the defense to present the theory that Conley's genetic material found on the victim's clothes could have been by contact transfer rather than from contact with Conley.

On appeal, Conley again argues he should have been permitted to testify he saw the victim and another girl touching each other in the backseat of the car after practice on the day the crime took place, and that victim had her shorts

down. He argues this provided an explanation for how the victim's underwear could have come into contact with his DNA as "Conley's car was saturated with his DNA[.]" Conley argues this explanation "was highly relevant and essential to his defense[]" as "even DNA evidence with limited probative value, such a Y-STR DNA testing, has a power[ful] influence on jurors[]" and cannot be harmless in light of the prosecution emphasizing in its closing argument "that the defense had provided no explanation as to how the DNA got on the underwear."

The Commonwealth disagreed, arguing that Conley was not driving his own car but a borrowed car that day,[2] and the trial court carefully considered the matter, clarifying that the ruling "did not preclude testimony that Conley saw [the victim] pull up her pants in the back seat of the car[.]" The Commonwealth argued that the defense chose not to ask Conley about the victim pulling her pants up in the back seat, but that even if the trial court erred in its ruling it was harmless given the strong evidence of guilt including the victim's testimony and the DNA evidence.

We review the trial court's decision on this evidentiary issue for abuse of discretion. *Bond v. Commonwealth*, 453 S.W.3d 729, 736 (Ky. 2015). "The test

---

[2] Conley testified at trial that he borrowed his roommate's car. Conley argued before the trial court regarding the KRE 412 motion that the car was saturated with his DNA, while the Commonwealth argued it was a borrowed car. In the appellate briefs, the parties made these same arguments.

for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

KRE 412 provides in relevant part as follows:

(a) Evidence generally inadmissible. The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):

    (1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.

    (2) Evidence offered to prove any alleged victim's sexual predisposition.

(b) Exceptions:

    (1) In a criminal case, the following evidence is admissible, if otherwise admissible under these rules:
. . .

        (C) any other evidence directly pertaining to the offense charged.

KRE 412 can be generally summed up as having the "exclusionary purpose of protecting the victim of a sex crime from an unfair and unwarranted assault on her character." *Powers v. Commonwealth*, 626 S.W.3d 563, 568 (Ky. 2021). This is of course subject to three exceptions when it comes to a criminal case, only one of which, KRE 412(b)(1)(C), could be applicable here.

In *Montgomery v. Commonwealth*, 320 S.W.3d 28 (Ky. 2010), the Court had to interpret the KRE 412(b)(1)(C) exception while also considering the Constitutional right to present a meaningful and complete defense. In doing so, the Court noted that the (1)(C) "residual exception for evidence 'directly pertaining to the offense charged'" was developed by the drafters "only as a safety valve to allow for unanticipated circumstances in which evidence of a victim's prior sexual conduct would be appropriate." *Montgomery*, 320 S.W.3d at 40. *See Ward v. Commonwealth*, 568 S.W.3d 824, 831 (Ky. 2019) (emphasizing that "the evidence must '*directly*' pertain to the offense charged").

The Court explained that the right to present a meaningful and complete defense is balanced with courts having the power to impose reasonable limits on cross-examination and the state's right to enact evidentiary rules. It also discussed how that balance was resolved in *Michigan v. Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), regarding a rape shield law. *Montgomery*, 320 S.W.3d at 41-42.

The Court clarified that it uses a "balancing test" to weigh the interests protected by the exclusionary rule against the defendant's rights and provided examples which demonstrated that the evidence should be allowed in if it is extremely probative and properly excluded if it is of marginal probative value. *Id.* at 42-43. The Court then definitely stated:

> We add little to this precedent by holding now that evidence of a sexual offense victim's prior sexual behavior pertains directly to the charged offense and thus is admissible under the KRE 412(b)(1)(C) residual exception if, and only if, exclusion of the evidence would be arbitrary or disproportionate with respect to KRE 412's purposes of protecting the victim's privacy and eliminating unduly prejudicial character evidence from the trial.

*Id.* at 43.

We agree with the Commonwealth that the trial court struck an appropriate balance by excluding the evidence of sexual conduct but permitting testimony that would support Conley's incidental transfer defense. The alleged sexual conduct between the victim and another girl was of low probative value in Conley's incidental transfer defense and did not *directly* pertain to the offense charged. Instead, the key potential testimony concerned providing a basis for how the victim's underwear could have been in direct contact with Conley's clothing or the car itself, with Conley being permitted to testify he saw the victim pull up her shorts. There would have been no reasonable basis to allow the evidence regarding the victim's sexual conduct, even if the motion had been timely and appropriate notice had been provided to the victim's family pursuant to KRE 412(c)(1).

Conley has not explained why allowing testimony that he saw the victim pull up her shorts was insufficient for his defense. In fact, statements defense counsel made when presenting the motion seem to indicate that the

-12-

defense would be satisfied with testimony that Conley saw the victim pull up her shorts.

However, testimony about the victim pulling up her shorts was never elicited from Conley. When Conley was asked by his counsel what he saw going on in the backseat of the car, Conley testified that he saw the girls "fumbling around" and "adjusting clothes." This was perhaps not the testimony that defense counsel desired, but there was nothing preventing Conley from testifying that he saw the victim pulling up her shorts or from counsel attempting to get the desired testimony from an additional question. The fact that Conley did not testify that he observed the victim with her shorts down in the car, does not mean that he should have been allowed to testify to the KRE 412 prohibited conduct instead. Therefore, the trial court appropriately excluded this evidence.

Conley's next argument is that the trial court erred by failing to exclude Juror 255 for cause, resulting in him having to use a preemptory strike and not being able to use that preemptory strike on another juror who ultimately sat on the jury.

During *voir dire*, the jurors were asked to raise their hands if they or a close friend or family member had ever been a victim of sexual violence. Juror 255 raised his hand and spoke privately to the trial court and counsel during a bench conference. Juror 255 disclosed that his granddaughter was a victim of

-13-

sexual violence eight to ten years earlier, it was reported and prosecuted in Illinois, he attended the trial which resulted in a conviction of his granddaughter's step-grandfather, but he was not sure how long of a sentence resulted as the man died in prison. Juror 255 stated he did not talk to his granddaughter much about the incident, and mostly talked to his daughter about it. He also explained he was not that close to his granddaughter and only sees her two or three times a year. Juror 255 was specifically asked about whether this incident would affect his impartiality:

> Q: How do you think that will affect your ability to hear this case?
>
> A: It won't have any effect on my ability on the case.
>
> Q: Do you think you can be fair and impartial to both sides, to both the prosecutor and the defense?
>
> A: Yes.

Defense counsel argued that Juror 255 should be stricken for cause given the close proximity in relationship, they did not know much about the incident, and that the incident was similar to the one before the jury, although the defense acknowledged that the incident was somewhat remote in time. The trial court denied the motion, explaining that based on Juror 255's responses and his demeanor, there was no reason to question his ability to be fair and impartial. However, the trial court stated, twice, that it would permit further enquiry, the

-14-

second time noting: "If you want to enquire further, now is the time to do it." Defense counsel declined to ask any additional questions.

In the motion for a directed verdict or new trial, Conley stated he was not permitted to exclude Juror 255 for cause and had to use a preemptory strike against him and argued that all doubt as to whether the juror could be fair should have been resolved in his favor.

The trial court denied the motion, noting that during the bench conference the trial court gave all counsel the opportunity to question this juror further, they declined this opportunity, and the trial court's previous ruling was that there was nothing from the juror's comments to make the trial court think he would not have the ability to be fair and impartial. As to Juror 255's demeanor, the trial court discussed the matter as follows:

> The Court notes the video recording of this proceeding does not show the bench conference and therefore only audio is available for review. The trial court was about to observe this juror's demeanor when speaking. The juror seemed comfortable with the subject matter he was questioned on, certain of his ability to be fair and impartial and understanding that the matter with his granddaughter would not affect his ability to look at the facts of this case independently.

On appeal, Conley argues that pursuant to the Kentucky Rules of Criminal Procedure (RCr) 9.36(1), Juror 255 should have been stricken for cause, explaining that even though the juror thought he could be fair and impartial, "it is

hard to imagine such a heinous act against one's own granddaughter would not come into play in a man's mind during a case involving allegations of sex crimes against a minor." Conley argued that as in *Ward v. Commonwealth*, 587 S.W.3d 312, 328-30 (Ky. 2019), despite the juror's words that she could be impartial, the trial court abused its discretion in failing to strike Juror 255.

We review the trial court's decision on whether to strike a juror for cause for abuse of discretion. *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007). However, the trial court's discretion in such a matter is "considerable" and in reviewing such a decision, we must duly consider "[the trial court's] view of the juror's demeanor and apparent candor[.]" *Moss v. Commonwealth*, 949 S.W.2d 579, 581 (Ky. 1997).

Criminal defendants have a constitutional right to a trial by an impartial jury. *Jackson v. Commonwealth*, 392 S.W.3d 907, 913 (Ky. 2013). RCr 9.36(1) states in relevant part that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified."

In making an RCr 9.36 determination as to whether a juror must be excused for cause,

> the court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor. Where the trial court determines that a juror cannot be impartial, RCr 9.36 requires a judge to excuse

-16-

that juror. RCr 9.36 is mandatory, and provides no room for a trial court to seat a juror who demonstrates his or her inability to be fair.

*McDaniel v. Commonwealth*, 341 S.W.3d 89, 92 (Ky. 2011) (citation and footnote omitted). As the Kentucky Supreme Court has repeatedly indicated, "when there is uncertainty about whether a prospective juror should be stricken for cause, the prospective juror should be stricken. The trial court should err on the side of caution by striking the doubtful juror; that is, if a juror falls within a gray area, he should be stricken." *Ordway v. Commonwealth*, 391 S.W.3d 762, 780 (Ky. 2013).

> Before a judge can come to the legal conclusion that a juror is or is not qualified at the voir dire stage, he must determine the credibility of the juror's answers. For instance, a juror might say he can be fair, but disprove that statement by subsequent comments or demeanor so substantially at odds that it is obvious the judge has abused his discretion in deciding the juror is unbiased.

*Shane*, 243 S.W.3d at 338.

However, "the mere fact that a prospective juror has been the victim of a crime similar to the crime being tried does not by itself imply a disqualifying bias. Additional evidence of bias is required." *Brown v. Commonwealth*, 313 S.W.3d 577, 598 (Ky. 2010).

> Obvious factors bearing on the likelihood of bias are the similarity between the crimes, the length of time since the prospective juror's experience, and the degree of trauma the prospective juror suffered. It is the totality of all the circumstances, however, and the prospective juror's responses that must inform the trial court's ruling.

*Id.*

> The same logic applies to a person who has a family
> member or friend who was the victim of a crime similar
> to the one being tried. *Woodall v. Commonwealth*, 63
> S.W.3d 104, 118 (Ky. 2001) (sister of rape victim);
> *Hodge v. Commonwealth*, 17 S.W.3d 824, 838 (Ky.
> 2000) (neighbor of murder victim).

*Dunn v. Commonwealth*, 360 S.W.3d 751, 770 (Ky. 2012).

In *Dunn*, the Court examined whether the past sexual abuse of a close

relative disqualified two jurors.

> Juror A said that his daughter had been the victim
> of sexual abuse in 2002, about eight years before the
> trial. He said that the person who "touched her
> inappropriately" had been prosecuted. He said that he
> did not think his daughter's experience would affect his
> ability to be fair because he was a "pretty analytical"
> person.
>
> Juror B said that his wife had been raped by her
> stepfather. Although the juror did not say how long ago
> this happened, it can be assumed that it was some time
> ago because the juror was fairly elderly. He said that
> what happened to his wife would not affect his ability to
> be fair and impartial. He said that he would not lean
> toward the prosecution if it was a close case.

*Id.* The Court noted that "[s]exual abuse of a child is a crime that creates strong

emotions. Indeed, most of the potential jurors in this case who had personal

experience with sexual abuse admitted that it could affect their ability to be

impartial, and they were excused for cause. But disqualification is not automatic."

*Id.* at 771. The Court determined that the trial court did not abuse its discretion in deciding that both of these jurors could be fair and impartial despite the past abuse of their family members, explaining as follows:

> Both Juror A and Juror B said that they believed they could be fair and impartial. They candidly answered questions from the judge, the prosecutor, and defense counsel. Neither juror needed to be "rehabilitated" – that is, asked if they could set aside their prejudice or bias to decide the case on the evidence – because they both stated unequivocally that they could be impartial. Therefore, there was no "additional evidence of bias" that would necessitate disqualification.

*Id.* (citation omitted).

Conley extensively references *Ward* as an example of when a trial court abused its discretion in not striking a juror for cause despite the juror's words about being able to be impartial. However, the circumstances surrounding Jury 277's *voir dire* testimony in *Ward* are very different from those surrounding Juror 255. In *Ward*, the Court concluded that "[t]he totality of the circumstances" which included the combination of her demeanor and answers, coupled with her suffering a similar crime as the victim in the case before the jury, "indicates that there was reasonable ground to believe that Juror 277 could not render a fair and impartial verdict on the evidence." 587 S.W.3d at 329. In making this determination, the Court noted:

> Despite the rape occurring some sixteen years before this case and the fact that she had "moved on with [her] life,"

> it was apparent from Juror 277's demeanor in answering defense counsel and the Commonwealth's questions that she had suffered a significant degree of trauma. Juror 277 initially stated that she "would really like to think" that she would be able to set aside her experiences and focus only on the facts of the case, but she then stated that she was still "evaluating" that. And, even though she eventually told the prosecutor that she "believe[d]" that she could be a neutral juror, it was only after a significant pause and sigh and several moments of holding back tears.

*Id.*

The problem for Conley is that Juror 255's responses that he could be impartial matched his demeanor as interpreted by the trial court. Indeed, Conley pointed to nothing in the juror's demeanor that belied his responses and, in our review, we observe that Juror 255's tone of voice was conversational and he had no hesitation in making his answers. Additionally, Conley declined to ask Juror 255 any additional questions to explore whether his assurances of impartiality were indeed true.

Because Conley had a "kind of vague distrust of" Juror 255 which was "unsupported by evidence of a genuine lack of impartiality," it was appropriate for him to use his preemptory challenge to remove this witness; this "is exactly the kind of concern for which peremptory challenges are provided." *Ordway*, 391 S.W.3d at 782. Therefore, the trial court's decision not to excuse Juror 255 for cause was appropriate as the juror's responses did not place his

likelihood of being impartial into "the grey area" in which the juror must be stricken.

Conley's third argument is that the prosecution falsely instructed the jurors that Y-STR DNA found on the victim's underwear was in fact Conley's DNA which rendered his trial fundamentally unfair. He requests palpable error review pursuant to RCr 10.26 because this issue was unpreserved.

Conley explains that Y-STR DNA testing, which was conducted on a cutting from the victim's underwear, targets sites located on the Y-chromosome and cannot identify a particular individual as the source of the DNA as this chromosome is passed on from father to son.[3] He explains that the Commonwealth's expert who testified about this evidence indicated that it is "1,626 times more likely that Mr. Conley or one of his male lineage relatives contributed to this DNA profile than another male in the United States population" and notes his concern that erroneous extrapolations of what that means by the jury could have a powerful impact on the jury despite its limited probative value compared to a DNA match which would "often [be] along the lines of a person

---

[3] For further information on Y-STR DNA testing, *see generally* 4 DAVID L. FAIGMAN *et. al*, Mod. Sci. Evidence § 30:32 *Special topics – Y-STR typing* (2021); 7 CLIFFORD S. FISHMAN & ANNE TOOMEY MCKENNA, Jones on Evidence § 60:34 Y-STR DNA; Scientific principles and methodologies; "sperm fraction" (7th ed. 2022).

being 108 quadrillion times more likely to have contributed to a profile than any other person in the United States."

Conley argues that the Commonwealth acted inappropriately in its opening and closing statements by telling the jury that Conley's DNA was in the underwear. He specifically complains that in the opening statement the prosecutor told the jury that "Mr. Conley's DNA matched being in the front crotch of her underwear." He states the conclusions made by the prosecution were even worse in the closing argument, quoting as follows:

> You have DNA evidence, ladies and gentlemen, DNA evidence. Josh Hynez came in here and we showed you the photograph, you'll get to take that back and look at it, of [the victim's] underwear that he tested, and where he took that cutting from front crotch of her underwear. And he said that it tested presumptively positive for saliva. And he told you that there are three things that test positive in that area: breast milk, feces, and saliva. And so it tested presumptively positive for saliva.
>
> And that same cutting went for DNA analysis by Kate Zopolos. And what did she get when she took extraction? She got some DNA. And it ultimately went on to Alison Tunstill. And Alison Tunstill performed that Y-STR, why? Because Kate saw Y chromosomes. Y chromosomes belong to males. And so, we had to figure out whose Y was that? Whose Y was that? Whose chromosome was found in the front crotch of [the victim's] underwear? Coach Conley.
>
> There is no reason ever, ever that your best friend's DNA should be in your daughter's underwear. There is no reason why a coach's DNA should be in a player's front crotch of her underwear, none. There has been zero

> explanation on how that might have got even transferred there. None.
>
> And we can talk about zeros, and how many zeros there are and likelihoods and statistics, and frequencies, but they're measured differently. They're measured differently from one person, from one analyst to another because they're looking at frequencies verses likelihoods. And they explained all of that as it goes to Y chromosomes.

Conley also states that the prosecution emphasized twice more that it was in fact Conley's DNA found in the victim's underwear. In the first instance, this occurred in regard to argument about the physical evidence, when the Commonwealth's attorney stated: "We know that the lab and the DNA all support [the victim]." Then, in an argument about believing witnesses and the victim despite her being a child, the Commonwealth's attorney stated: "And that includes the right to be believed by twelve adults when supported with physical evidence, physical injury to her body and his DNA which cannot be explained as being in the front crotch of her underwear."

"In considering an allegation of prosecutorial misconduct, the Court must view that allegation in the context of the overall fairness of the trial." *Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017). "[W]e . . . may reverse only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (footnote omitted).

In considering an allegation of prosecutorial misconduct in closing argument, the Court considers the arguments "as a whole" while remembering that counsel is granted wide latitude during closing argument. *Brewer v. Commonwealth*, 206 S.W.3d 343, 350 (Ky. 2006) (quoting *Young v. Commonwealth*, 25 S.W.3d 66, 74-75 (Ky. 2000)). "The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom." *Padgett v. Commonwealth*, 312 S.W.3d 336, 350 (Ky. 2010) (citing *East v. Commonwealth*, 249 Ky. 46, 60 S.W.2d 137, 139 (1933)).

*Murphy*, 509 S.W.3d at 50.

"Where there was no objection, we will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair."

*Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010).

We employ a four-part test to determine whether a prosecutor's improper comments amount to flagrant misconduct. The four factors to be considered are: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused."

*Murphy*, 509 S.W.3d at 54 (quoting *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky. 2010), *superseded on other grounds by* KRS 503.055 and 503.050).

Conley heavily relies on *Duncan*, arguing that *Duncan* is similar to his situation and warrants reversal based on the prosecutor's flagrant comments misrepresenting the DNA evidence. We disagree.

-24-

In *Duncan*, the Kentucky Supreme Court concluded that Duncan's trial was rendered unfair by prosecutorial overreaching by the prosecutor misrepresenting key aspects of the Commonwealth's evidence during Duncan's cross examination and the Commonwealth's closing argument. *Duncan*, 322 S.W.3d at 87-93. In *Duncan*, the expert witness Cassie Johnson testified about the Y-STR testing, and matching alleles to both Duncan and the victim's stepfather, but not about any statistical significance of Duncan's matches:

> The first test Johnson's lab performed targeted ten sites and from the sample isolated from the panties yielded results for seven of them. At all seven of those sites, Duncan's alleles occurred. In 2005, Johnson's lab analyzed the samples again, this time with a new version of the test that targeted seventeen Y-chromosome sites. For the sample recovered from SM's panties, the test yielded results at ten of the seventeen. At two of those sites two alleles were detected, indicating that the sample contained a mixture of DNA from two men. At all ten of the sites where results were obtained, Duncan's alleles occurred. At the two sites where an additional allele was detected, that allele matched the step-father's corresponding allele. At four other of the ten result-yielding sites Duncan's and the step-father's alleles were the same. Johnson concluded that Duncan and the step-father were both potential contributors to the mixture, and neither Duncan nor any male in his paternal lineage could be excluded as a source of the DNA recovered from SM's panties. *Johnson was not asked for and did not offer any testimony regarding the statistical significance of her results. The jury was told that Duncan could not be ruled out, but it was not told that anyone else could be either.*

*Given this complete lack of evidence regarding the significance of Duncan's partial match, it was a gross misrepresentation of Johnson's testimony for the prosecutor to suggest that the "DNA has to be wrong" for Duncan's version of events to be right.* The DNA evidence was consistent with a scenario in which Duncan was the perpetrator. *Given Johnson's very limited testimony, however, (the failure to establish through statistics or otherwise the significance of the finding) it was also consistent with a scenario in which any other man on the planet was the perpetrator, and thus did not need to be wrong for Duncan's testimony to be right.* The prosecutor compounded the impropriety by having Duncan acknowledge, one by one, all ten sites at which his profile matched the partial profile obtained from the panty sample. *The significance of those matches is precisely what the expert failed to establish, and by suggesting that those matches were either "wrong" or conflicted with Duncan's testimony the prosecutor invited the jury to be its own expert – to make inferences that it was not qualified to make and which amounted to pure speculation.* This was a flagrant abuse of cross-examination that, given the aura of conclusiveness that surrounds DNA evidence, rendered Duncan's trial manifestly unfair.

. . .

This conclusion is underscored by portions of the prosecutor's closing argument to which Duncan objected. *Twice during that portion of her argument based on Johnson's testimony, the prosecutor went from quoting Johnson's conclusion that Duncan could not be excluded as a source of the DNA in SM's panties, to insisting that "not excluded" means "included," to "the bottom line: What is Errick Duncan's DNA doing in SM's panties?"* Counsel objected both times the prosecutor reached this "bottom line" assertion, and following the second objection the court admonished the jury to the effect that while the evidence had not established "a direct, absolute

match," both sides were allowed to argue reasonable inferences from the evidence. Duncan maintains that the prosecutor's argument went beyond "reasonable inference" and had the effect, like that of the improper cross-examination, of misrepresenting Johnson's testimony. For the reasons discussed above, we agree.

The problem is not that the evidence failed to establish a match between Duncan's profile and the profile obtained from the sample. The evidence established a match, or a partial match, at ten of the seventeen tested sites. *But missing from the Commonwealth's proof was any testimony establishing the significance of that partial match. Johnson's testimony that Duncan could not be excluded as a source of the panty DNA said nothing at all about how likely or unlikely it was for such a partial match to occur, and most assuredly it did not say that Duncan was the source.* By asking the jury to infer on the basis of Johnson's testimony that he was, the prosecutor sought to wring from that testimony a conclusion it could not reasonably yield.

*Id.* at 90-92 (emphasis added) (footnotes omitted).

In contrast, the testimony of Tunstill was far more definitive and established the significance of the match between Conley's buccal sample and the Y-STR analysis of the sample from the victim's underwear, explaining how likely such a match was to occur within the United States male population as shown in the following testimony:

> Q:    And, so, can you tell us what the results and conclusions of your examination was?
>
> A:    The partial Y-STR profile from the cutting from the front crotch of the underwear matches Corvell Conley and his paternal relatives. Utilizing a

-27-

subset of the YHRD United States database and assuming a single source profile, the match is estimated to be 1,626 times more likely to occur if Corvell Conley or a paternal relative is a contributor of the Y-STR profile than if the source is a randomly selected male from the United States population. . . .

. . .

Q:      Should we place less emphasis on your results because you're telling us it's 1,626 more times likely than say Kate's frequency [about the identification of the victim's DNA] where she's talking in terms like septillions and octillions and 25 and 27 zeroes?

A:      I don't know that I would place less emphasis on it, it's just a matter in the way in how the statistic has to be calculated owning to the fact that we know that males can share the same Y-STR profile. There was still a match to, from the cutting of the crotch of the underwear to Corvell Conley or one of his paternal relatives, and we do know, like we said, that males can share the same Y-STR profile. It is just a completely different way that the statistic has to be calculated, knowing there is more than one person that has that same Y-STR profile.

We see nothing improper about the opening statement from the Commonwealth attorney which accurately stated that Conley's DNA matched that found in the victim's underwear. While the closing statement went further, not just declaring that it was a match, but that it was Conley's chromosome and DNA, we do not believe that *Duncan* requires a reversal. In *Duncan*, the problem was not

-28-

just the prosecutor's rhetorical question in the closing argument asking "[w]hat was [the defendant's] DNA doing in [the victim's] panties?" but also the lack of an evidentiary basis for this statement.[4] The context of what the expert testified to regarding the "match" is important as here the jury heard substantial testimony about the significance of the DNA analysis and the chance of a random male having the same Y-STR profile as that found in the sample from the underwear, and how that compared to other types of DNA evidence.[5] As the defense reminded the jury of during its closing argument, previous testimony was that DNA attributed to the victim came back with big numbers containing twenty-four zeroes and could match no one but her, while the chance of the DNA being matched to Conley only came out at odds of one in 1,626, far fewer than the number of people in Hardin County.

---

[4] Our interpretation is consistent with that given in *Gray v. Commonwealth*, No. 2020-SC-0335-MR, 2021 WL 1680267, at \*4 (Ky. Apr. 29, 2021) (unpublished) in interpreting and quoting from *Duncan*, 322 S.W.3d at 92:

> We held the statement resulted in reversible error, not solely because of the statement itself, but also because the statement lacked an evidentiary basis given the statistical meaning of the DNA evidence. The DNA evidence was statistically inconclusive, indicating the defendant could have been the perpetrator but in a way equally "consistent with a scenario in which any other man on the planet was the perpetrator."

[5] Given a similar situation, where testimony was given that the chances were 891 to 1 that another man in the United States would have this profile, the Court in *Gray* decided the prosecutor's conduct in stating it was the defendant's DNA was not flagrant, although we note that in *Gray* the statement was made only once. *Id.* at \*4-5.

While the comments about the DNA being found in the underwear being "his" rather than just "a match" to Conley's DNA in the Y-STR comparison which included other males was not technically accurate, it could reasonably be inferred from the evidence. Therefore, we do not believe the prosecutor's remarks tended to mislead the jury or prejudice Conley.

Conley's final argument is that the trial court erred in allowing the SANE nurse to testify that the victim identified Conley as the perpetrator. Conley initially stated that this issue is preserved for appellate review.

The Commonwealth argues:

(1) there is no error for this court to consider since Conley requested, and received an admonition in response to his objection; (2) should the Court decide to consider the alleged error, it was not properly preserved as defense counsel offered different grounds for her objection during trial; and (3) should the Court decide to consider the issue under the palpable error standard, Conley is not entitled to relief.

In his reply brief, Conley requested palpable error review as to the testimony concerning the SANE nurse identifying the basketball coach as the victim's attacker, arguing that allowing that testimony was not harmless as Conley was found not guilty of the rape.

Having reviewed the testimony regarding identification, we agree with the Commonwealth that no objection was made at either time the SANE nurse stated that the victim identified her attacker as her coach. The first reference to the

-30-

victim's attacker being her coach took place during the following exchange between the Commonwealth attorney and the SANE nurse:

> Q.  What information did she initially give you as to why she was there at [inaudible] hospital?
>
> A:  She stated to me that she had been sexually assaulted by her basketball coach and wanted, wanted an exam.

An additional exchange of a question and answer took place about where the SANE nurse focused her examination. It was about two minutes after the SANE nurse testified about the victim's disclosure that she was sexually assaulted by her basketball coach that an objection was made as part of the following exchange:

> Q:  And why did you focus in that area [the vagina], did she give you any descriptions of oral sex or sexual intercourse?
>
> A:  Yes, I have her statement verbatim; she told me –
>
> Defense Counsel:  Objection, hearsay.

During the subsequent bench conference, defense counsel stated: "I'm objecting to hearsay and it's going beyond the medical exception. She is going into the whole statement of, okay, where they were, or different things, what he said, this has nothing to do –".

Although the trial court's response to argument is inaudible, apparently the trial court agreed to give an admonition as after the bench conference concluded, the trial court told the jury:

Ladies and gentlemen of the jury, let me give you the following admonition. Sometimes there is evidence that is introduced that has a limited purpose and this is the type of evidence that has such a limited purpose. Obviously, Nurse Bashaw is testifying as to what someone else told her and that is classical hearsay. But it is admissible, and you may use that information to understand, if it helps you understand, what actions that she took in the course of her examination, why did she take certain medical treatment. Does everyone understand that? So, it's not – this testimony is not offered for the truthfulness of what she is told. It is to be used by you to understand what actions or examination techniques or procedures that she used. Everybody understands that limited purpose? Everyone seems to.

Following this admonition, the following exchange took place which again identified the victim's attacker as her coach:

> Q: So, you were told by [the victim] that she had sexual intercourse with her coach, is that correct?
>
> A: Correct.

No objection was made to this exchange.

Because the grounds upon which Conley assigns error now were not appropriately preserved by a contemporaneous objection, we review for palpable error. "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

-32-

> For an error to be palpable, it must be easily perceptible, plain, obvious and readily noticeable. A palpable error must involve prejudice more egregious than that occurring in reversible error. A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error. If not, the error cannot be palpable.

*Brewer*, 206 S.W.3d at 349 (internal quotation marks, citations, footnotes, and brackets omitted).

> As provided in KRE 803(4), there is a hearsay exception for:

> Statements for purposes of medical treatment or diagnosis. Statements made for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis.

While the method by which sexual abuse took place and to which part of the body is pertinent to treatment, the identity of the perpetrator is not pertinent. *Hoff v. Commonwealth*, 394 S.W.3d 368, 374 (Ky. 2011). "There is no inherent trustworthiness to be found in a hearsay statement identifying the perpetrator when that statement did not arise from the patient's desire for effective medical treatment." *Colvard v. Commonwealth*, 309 S.W.3d 239, 245-46 (Ky. 2010).

Therefore, testimony by a medical provider identifying the alleged perpetrator in a trial is clear error. *Justice v. Commonwealth*, 636 S.W.3d 407, 414-15 (Ky. 2021).

As noted in *Hoff*, 394 S.W.3d at 373, "it is highly prejudicial for a doctor or other professional to repeat the hearsay statement of a child identifying the child's abuser." However, palpable error does not necessarily occur from such clear error. *Justice*, 636 S.W.3d at 415.

Conley relies on *Hoff* to justify a reversal. In *Hoff*, 394 S.W.3d at 373-77, a number of hearsay statements were let in through the doctor's testimony, including the doctor twice stating who the child victim identified as the perpetrator, that the named perpetrator took the victim to Louisville for the purpose of allowing an unnamed man to sexually abuse her, and that the victim told her teacher about being raped and wrote in her diary about it, as well as the complete forensic examination report which included additional details and statements from the doctor which the jury could interpret as the doctor's belief in the truthfulness of the victim's statements. Although these errors were unpreserved, the Court concluded they rose to the level of palpable error and required reversal. *Id.* at 377-79.

However, *Hoff* does not require that we find palpable error and reverse here. In *Justice*, the Court recounted the errors in *Hoff* but determined that the unpreserved errors before it did not require reversal. In *Justice*, 636 S.W.3d at 415, the doctor told the jury that the children identified the defendant as the

perpetrator, but the children also testified at trial to the same thing and the reports before the jury were redacted so that they did not say who the children identified as their abuser. While the Court noted the defendant's argument that the identifying statements prejudicially bolstered the children's testimony, and the Court acknowledged this was "likely true" the Court decided that "while some prejudice may have resulted, we do not find it to be of the egregious nature that shocks the conscience." *Id.*

In considering the whole trial, while the two unpreserved statements from the SANE nurse recounting that the victim identified "her coach" as the perpetrator were clearly hearsay and did bolster the victim's testimony identifying Conley as her attacker, the trial court correctly instructed the jury that this evidence was not provided for its truth. Additionally, the report from the SANE nurse was not admitted into evidence at all. We do not believe the admission of this hearsay testimony to be a "defect . . . so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process[,]" *Martin*, 207 S.W.3d at 5, or to be "so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings" so as to make it "a 'substantial possibility' that the result in the case would have been different without the error[,]" *Brewer*, 206 S.W.3d at 349. Therefore, reversal is not warranted for this unpreserved error.

Accordingly, we affirm Conley's sodomy conviction and sentence by the Hardin Circuit Court.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Brandon Neil Jewell
Kathleen K. Schmidt
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General
Frankfort, Kentucky